UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| COLUMBIA SUSSEX CORP., INC. and ) | |
| WIMAR TAHOE CORP., ) | |
| ) | |
| ) | Case No. 4:06CV118SNL |
| Petitioners. ) | |
| ) | |

### MEMORANDUM OPINION

This matter is before the Court on Petitioners' Writ of Prohibition to the United States Bankruptcy Court for the Eastern District of Missouri asking this Court to dissolve a TRO entered by the Bankruptcy Court on January 25, 2006 and extended until February 8, 2006; and to deny a related motion for a preliminary injunction for lack of subject matter jurisdiction (#1), filed January 26, 2006. Respondents President Casinos (PCI) and its subsidiary President Riverboat Casino-Missouri, Inc. (PRC-MO) have filed a pleading in opposition. An expedited hearing was held before the Court on Tuesday, January 31, 2006.

Before addressing the matter presently before the Court, it is necessary to briefly set forth background information.[1] The respondents are debtors-in-possession in an underlying Chapter 11 bankruptcy case which commenced on June 20, 2002. Currently, the principal asset of the bankruptcy estate is the Admiral riverboat casino moored near Laclede's Landing in St. Louis, Missouri.

---

[1] This brief recitation of the background facts are taken from the parties' pleadings, as well as the transcript of a hearing before the Bankruptcy Court on January 17, 2006 and another hearing before the Bankruptcy Court on January 27, 2006. Debtors' Exhibit D; Petitioners' Exhibit A.

In 2004 contract negotiations began between petitioner Columbia Sussex and the debtors for Columbia Sussex' purchase of the assets/stock of PRC-MO. In connection with this contract negotiation, Columbia Sussex' affiliate Wimar Tahoe acquired ownership of a parking lot located across the street from the Admiral. This parking lot is commonly referred to as the "Cherrick lot". The Cherrick lot was regularly used by Admiral patrons pursuant to a validation agreement between PRC-MO and the prior owners whereby PRC-MO paid a flat fee of $1.50 for each Admiral patron who parked at the Cherrick lot and later presented a validated ticket from the Admiral. No such agreement existed following the purchase of the lot by Wimar Tahoe.

In October 2005, contract negotiations for the sale of the Admiral ceased and no further contract negotiations ensued.

On or about December 16, 2005 Wimar Tahoe and the third-party lessee (St. Louis Parking) of the Cherrick lot terminated the lessee's lease of the lot. The terminated lease had allowed for an increase in parking rates without the consent of PRC-MO.

On or about December 16, 2005 Wimar notified PRC-MO of a parking increase for the Admiral patrons (as well as all other persons wishing to park on the Cherrick lot) from $1.50 per car to $6.00 per car beginning December 17, 2005. On or about December 22, 2005 Wimar notified PRC-MO of another parking increase for all cars parked on the Cherrick lot, beginning December 24, 2005.[2]

Between December 17 and 30, 2005, Admiral patrons continued parking on the Cherrick lot and the petitioners accepted parking tickets validated by PRC-MO. In order to recoup the

---

[2]Evidence indicates that the parking rate increased to $10.00 per car for "regular" parking and upwards to $25.00 per car for "special events" parking.

monies owed on the validated parking tickets, petitioners requested payment by PRC-MO in the amounts of $44,094.00 and $91,580.00, for a total balance owed of $135,674.00.

On December 30, 2005 petitioners ceased honoring validations from casino patrons of the Admiral. However, anyone, including Admiral patrons, could continue to park on the Cherrick lot as long as the parking fee was paid upfront.

On or about January 12, 2006 the debtors filed the underlying adversary proceeding asserting two (2) substantive claims: 1) a claim of breach of contract against Columbia Sussex arising from the failed efforts to purchase the Admiral; and 2) a claim of *prima facie* tort against Wimar Tahoe regarding the increased parking rates at the Cherrick lot. Upon filing its adversary complaint, debtors applied for a TRO and a preliminary injunction seeking to require the petitioners to accept parking validations from PRC-MO at the Cherrick lot at the rate of $1.50 per car.

All parties filed briefs regarding the injunctive relief requested, and on January 17, 2006 the Bankruptcy Court held a hearing on same. On or about January 25, 2006 the Bankruptcy Court entered a TRO ordering the petitioners "restrained from blocking access to a certain parking lot owned by Wimar and located on Leonor K. Sullivan Boulevard in St. Louis, Missouri, commonly referred to by the parties as the "Cherrick Lot" to patrons of the Admiral riverboat casino for use for validated parking . . .". Debtors' Exhibit 8 - TRO entered by Bankruptcy Court on January 25, 2006. The petitioners were further ordered "restrained from charging a validation fee payable by Debtors for use of the Cherrick Lot greater than $1.50 per Admiral riverboat casino patron vehicle . . ." Debtors' Exhibit 8. The debtors were ordered to post a cash bond as security for the preliminary injunction request. Finally, the Bankruptcy Court directed that "[t]his Temporary Restraining Order shall become effective after Debtor PRC-MO pays to Defendants

3

**[petitioners]** $135,674 in immediately available funds, representing fees claimed to be owed to Defendants on account of PRC-MO's validation of parking tickets for the period prior to December 30, 2005, which payment shall be without prejudice to PRC-MO's claim to seek to recoup any portion of such amount representing validation fees in excess of $1.50 per car if Plaintiffs **[debtors]** prevail on the merits of their claim for *prima facie* tort in this proceeding, subject to any applicable offsets if Defendants prevail on the merits of any of their defenses to such claim. . .".  Debtors' Exhibit 8.

On January 27, 2006 the Bankruptcy Court held another hearing to consider an extension of the TRO issued on January 25, 2006.  At the conclusion of the hearing, the Bankruptcy Court extended the TRO until 5:00 p.m. on February 8, 2006.

Meanwhile, on January 26, 2006 petitioners filed this request for a writ of prohibition seeking to dissolve the TRO and deny the motion for a preliminary injunction currently pending before the Bankruptcy Court.  Petitioners argue that "[t]his restraining order was entered notwithstanding that the casino operator does not have or claim any property interest in the parking lot at issue and has no rights by lease, license, or otherwise to influence, let alone direct, which individuals Petitioners allow to park on their lot, for what price, and under what credit arrangements."  Petitioners' Petition for Writ of Prohibition, Document #1, pgs. 1-2.  Petitioners argue that the TRO was in effect a "taking" and that the Bankruptcy Court was without jurisdiction to take private property from Petitioners and give it to the Debtors for its use and enjoyment.  They argue that the TRO is in direct conflict with the United States Supreme Court case of <u>Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308 (1999) which they believe stands for the proposition that a federal court is prohibited from issuing

4

preliminary injunctive relief in an action at law to prevent a defendant from exercising control over its property pending adjudication of a claim for money damages.

Upon review of the parties' pleadings, the Bankruptcy Court's orders, and relevant caselaw, the Court determines that the request for the writ of prohibition should be denied.

Although the petitioners prefer to define the issue at hand as one of the extent of a federal court's equity powers in an action of law, especially as regards property rights; this Court views the issue before it much narrower: Did the Bankruptcy Court have subject matter jurisdiction to enter a TRO against a defendant in a core adversary proceeding regarding real property not part of the bankruptcy estate?  It is important to note that this is not a dispute as to the merits of the underlying adversary proceeding or even the merits of the issuance of the TRO; but rather, a jurisdictional issue specific to the situation at hand.

Subject matter jurisdiction of the Bankruptcy Court is established by 28 U.S.C. §§157 and 1334.  Section 1334 provides that "the district court shall have original and exclusive jurisdiction of all cases under title 11."  Under §157(a), district courts may "provide that any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . shall be referred to the bankruptcy judges for the district."  If the Bankruptcy Court properly exercised subject matter jurisdiction as regards its issuance of the TRO, the basis for that jurisdiction must be that the request for such injunctive relief was "related to" the bankruptcy case and the underlying adversary proceeding.

"For subject matter jurisdiction to exist in a `related to' action, there must be some nexus between the civil proceeding and the Title 11 case." Integrated Health Services of Cliff Manor, Inc. v. THCI Company, LLC, 417 F.3d. 953, 958 (8th Cir. 2005) *quoting* Specialty Mills, Inc. v. Citizens State Bank, 51 F.3d. 770, 774 (8th cir. 1995).  In order for the courts to assert

jurisdiction over a proceeding "related to" a bankruptcy case, the proceeding must `have some effect on the administration of the debtor's estate.'" Specialty Mills, at 774 *quoting* In re Dogpatch U.S.A., Inc., 810 F.2d. 782, 786 (8th Cir. 1987); *see also*, Abramowitz v. Palmer, 999 F.2d. 1274, 1277 (8th Cir. 1993) *quoting* In re Dogpatch, at 786.  The Eighth Circuit Court of Appeals has adopted the "conceivable effect" test for determining whether a civil proceeding is related to a bankruptcy case:

> "[T]he test for determining whether a civil proceeding is
> related to bankruptcy is whether the outcome of that proceeding
> could conceivably have any effect on the estate being
> administered in the bankruptcy . . . An action is related
> to bankruptcy if the outcome could alter the debtor's rights,
> liabilities, options, or freedom or action . . . and which in
> any way impacts upon the handling and administration of the
> bankrupt estate."

Specialty Mills, at 774 *quoting* In re Dogpatch, at 786 (*quoting* Pacor v Higgins, 743 F.2d. 984, 994 (3rd Cir. 1984)); Abramowitz, at 1277 *quoting* In re Dogpatch, *supra.*; *see also*, Integrated Health Services of Cliff Manor, at 958; In re Farmland Industries, 296 B.R. 793, 803-04 (8th Cir. BAP 2003); In re Powell, et. al., 224 B.R. 409, 412 (8th Cir. BAP 1998); Commerce Bank, N.A. v. Tifton Aluminum Co., Inc., 217 B.R. 798, 800-01 (W.D.Mo. 1997).  Such a test "implements a fairly broad interpretation of the scope of a bankruptcy court's `related to' jurisdiction", Abramowitz, at 1277, and even a proceeding "which portends a mere contingent or tangential effect on a debtor's estate" meets the broad jurisdictional test adopted by the Eighth Circuit, In re Titan Energy, Inc., 837 F.2d. 325, 330 (8th Cir. 1988).  This "breadth" of the scope of "related to" jurisdiction signifies that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate". Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995) *quoting* Pacor,  at 994 (internal citations omitted).  Furthermore, "the `related to' language of §1334(b)

6

must be read to give district courts (and bankruptcy courts under §157(a)) jurisdiction over more than simple proceedings involving the property of the debtor or the estate.  Celotex Corp., 514 U.S. at 308.

Applying the "conceivable test" as established by the Eighth Circuit, this Court holds that the Bankruptcy Court properly asserted jurisdiction over the adversarial proceeding as regards the issuance of the TRO.  The outcome of the underlying adversarial proceeding, including the issuance of the TRO, conceivably could affect the administration of the bankruptcy estate.  The *prima facie* tort claim seeks to protect the status of the monies available in the bankruptcy estate. If the bankruptcy estate continued to lose its monetary assets; i.e. loss of patrons to the Admiral and the resultant gambling profits, the bankruptcy estate's administration would be affected directly, and in a significant way, because the priority and amounts owed creditors would be affected.  Paying higher parking rates for its patrons constitutes a threat to the viable administration of the bankruptcy estate; i.e., decrease in monies available to the estate to distribute to its creditors.  The Bankruptcy Court had jurisdiction to issue the TRO because the increase in monies paid to Wimar Tahoe due to the increases in parking rates impacted upon the administration of the bankruptcy estate.

The petitioners expend considerable time and energy challenging the merits of the TRO request and attacking the Bankruptcy Court's order for what it believes to be insufficient weight to their arguments regarding other additional parking for Admiral patrons, the unfairness of the injunctive relief, the antiquated concept of *prima facie* tort, and most of all, the application of their primary case in support: Grupo Mexicano, *supra*.  This Court has carefully read the Grupo Mexicano case and finds it inapplicable.  The Grupo Mexicano case concerned itself with a plaintiff who sought to freeze the assets of a defendant in anticipation of a future money

7

judgment.  The United States Supreme Court held that a plaintiff who seeks only money damages from a defendant is not entitled to a preliminary injunction in order to freeze the assets of same defendant in anticipation of a money judgment, especially wherein the plaintiff has no prejudgment lien on the bank account.  <u>Grupo Mexicano</u>, 527 U.S. at 310.  The holding in <u>Grupo Mexicano</u> is strictly limited to its facts, and most importantly, does not deal with the issue of bankruptcy jurisdiction which is statutorily conferred.  This Court is not inclined to apply <u>Grupo Mexicano</u> so broadly as to interfere with the bankruptcy court's injunctive powers under §105(a).

Accordingly, this Court determines that the Bankruptcy Court had subject matter jurisdiction to enter a TRO on January 25, 2006 and to extend it to February 8, 2006.  This Court will not dissolve the TRO presently in effect, nor interfere with the Bankruptcy Court's eventual ruling on the debtors' request for a preliminary injunction.

Dated this   8th    day of February, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE